# Recap

- Patient Onboarding Overview
- Patient Activation Measure
- Motivational Interviewing
- Scripting
- Cerner Training
- Comprehensive Health Evaluation

© 2022 DaVita Inc. All rights reserved. Proprietary and confidential.

199

DaVita.

# Questions??

© 2022 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

200

# Appendix

© 2021 DaVita Inc. All rights reserved. Proprietary and confidential.



# Cyracom

Cyracom is a translation service that provides immediate access to live over the phone interpreters.



- Dial **1 (855) 435-2341**
- Say the language you would like or for Spanish Press 2
- Enter your 5 digit Facility number (CBO #)
- Enter you phone Number
- Interpreter will greet you in English and the patient in their Native Language and let Patient know they will be interpreting for them and will keep it confidential.



202    © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.

# Notice of Privacy Practices

Notice of privacy practices must be uploaded before the CHE. This job aid is a temporary process for patients who were onboarded at the Neph Practice prior to the NPP being added to the welcome packet.

- ✓ The original consent packet did not include the NPP
- ✓ We mailed each CKD + Non-DaVita ESKD patient an 8-page NPP in the mail
- ✓ For any patient who signed the original consent packet that did not include the NPP, the CC scheduling the CHE must use the script below to ensure patients have been notified
- ✓ Please read the script below before scheduling the CHE



**Notice of Privacy Practices – Steps for patients who were onboarded at Nephrology Practice prior to NPP being included in welcome packet**

**Overview:**

This is a temporary process for patients who were onboarded at the Nephrology Practice prior to the NPP being added to the consent packet. Notice of Privacy Practices (NPP) must be uploaded before the CHE – Comprehensive Health Evaluation.

**PURPOSE**

- The original consent packet did not include the NPP
- We mailed each CKD + Non-DaVita ESKD patient an 8-page NPP in the mail
- For any patient who signed the original consent packet that did not include the NPP, the CC scheduling the CHE must use the script below to ensure patients have been notified
- Please read the script below before scheduling the CHE

"We've sent you a copy of our Notice of Privacy Practices via mail. Our Notice of Privacy Practices details how IKC accesses, utilizes, and discloses your information in relation to the health care services we provide. We would appreciate your signature on the acknowledgment form included at the end of the notice. This states that you have received a copy from us in relation to the services provided by IKC. You can sign and return to us using the return address included. If you would like further detail about these practices, you can find more information in the Notice of Privacy Practices themselves."

**TM can then mark patient as received by uploading blank NPP.**

Blank NPP can be found on the VillageWeb at:

https://villageweb.davita.com/Depts/VillageHealth/CKCC/Pages/default.aspx

Under "Notice of Privacy Practice" find the consent for your market and upload this copy to the patient's chart in Cerner.



 © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.

# Common Acronyms (A – F)

| Acronym | Meaning | Acronym | Meaning | Acronym | Meaning |
|---------|---------|---------|---------|---------|---------|
| ACR | All Condition Readmission | CIP | Clinical Incentive Program | CVC | Central Venous Catheter |
| AKI | Acute Kidney Injury | CKCC | Comprehensive Kidney Care Contracting | DC | Direct Contracting |
| APP | Access Placement Pathway | CKD | Chronic Kidney Disease | DCR | DaVita Clinical Research |
| AVF | Arteriovenous Fistula | CMMI | Center for Medicare & Medicaid Innovation | DKC | DaVita Kidney Care |
| AVG | Arteriovenous Graft | CMS | Centers for Medicare & Medicaid Services | DVA | DaVita |
| BDP | Best Demonstrated Practice | CMT | Clinical Management Tool | EHR | Electronic Health Record |
| CAPD | Continuous Ambulatory Peritoneal Dialysis | CQA | Clinical Quality Administrator | EOL | End of Life |
| CC | Care Coordinator | CRF | Chronic Renal Failure | ESKD | End Stage Kidney Disease |
| CCPD | Continuous Cycling Peritoneal Dialysis | CSNP | Chronic Special Needs Plan | FA | Facility Administrator |
| CHE | Comprehensive Health Evaluation | CT | Conservative Therapy | FFS | Fee-for-Service |

204     © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.

# Common Acronyms (G – P)

| Acronym | Meaning | Acronym | Meaning | Acronym | Meaning |
|---------|---------|---------|---------|---------|---------|
| GFR | Glomerular Filtration Rate | KDE | Kidney Disease Education | OP | Outpatient |
| HD | Hemodialysis | KS | Kidney Smart | OS | Optimal Starts |
| HHD | Home Hemodialysis | MATCH-D | Method to Assess Treatment Choices for Home Dialysis | PAM | Patient Activation Measure Survey |
| HIPAA | Health Insurance Portability and Accountability Act | MOC | Model of Care | PCC | Patient Centered Care |
| HRM | Home Remote Monitoring | MR | Medical Record | PD | Peritoneal Dialysis |
| ICHD | In-Center Hemodialysis | MRN | Medical Record Number | PDC | Peritoneal Dialysis Cathater |
| IDT | Interdisciplinary Care Team | Neph. | Nephrologist | PEM | Practice Engagement Manager |
| IKC | Integrated Kidney Care | NHD | Nocturnal Hemodialysis | PHI | Protected Health Information |
| IKCA | Integrated Kidney Care Administrator | NP | Nurse Practitioner | PHQ-9 | Patient Health Questionnaire 9 |
| KCE | Kidney Contracting Entity | OCMO | Office of Chief Medical Officer | POC | Plan of Care |

205   © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.

# Common Acronyms (P – V)

| Acronym | Meaning | Acronym | Meaning | Acronym | Meaning |
|---------|---------|---------|---------|---------|---------|
| PPR | Patient Prioritization Report | UACR | Urine Albumin-to-Creatinine Ratio | | |
| PT | Patient | UTR | Unable to Reach | | |
| R&R | Roles and Responsibilities | VAP | Vascular Access Planning | | |
| RN | Registered Nurse | VBC | Value Based Care | | |
| ROM | Regional Operations Manager | VS | Vascular Surgeon | | |
| RRF | Residual Renal Function | | | | |
| RRT | Renal Replacement Therapy | | | | |
| TM | Teammate | | | | |
| TOC | Transition of Care | | | | |
| Tx | Treatment | | | | |

206   © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.



# Cerner Tasks and Locations

## Welcome, Consents, PAM, CHE Scheduling

| CC Task | Cerner Location |
|---|---|
| Verify Demographics | Summary mPage, Summary |
| Confirm Program Alignment | Summary mPage, Manage Case |
| Upload Consents | Note Scan Import |
| Upload Consents | WQM |
| Adding Providers (Nephrologist, etc.) | Summary mPage, Providers |
| Where to locate MBI | Summary mPage, Health Plans |
| Administering the PAM | Flourish |
| Entering PAM Score & Activation Level from Flourish | Patient Activation Measure (PAM) PowerForm |
| Modifying PAM date in Cerner | Summary mPage, Forms |
| CHE Outreach | CHE Outreach PowerForm |
| CHE Scheduling | Cerner PM |
| Adding Secondary Insurance | Cerner PM, Insurance |
| Adding Patient Phone Number | Active Case mPage, Demographics |

207   © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.



# Cerner Tasks and Locations

## Welcome, Consents, PAM, CHE Scheduling

| CC Task | Cerner Location |
|---|---|
| Open Pt. Onboarding Report (refresh every day) & Filter by Practice | HealtheAnalytics |
| Adding Nephrologist / Provider Appointment | AdHoc, Care Mgmt, Renal Care Mgmt, Appointment Tracking |
| Entering Date of Death | Cerner PM, Additional Demographics and Guarantor Information, Date of Death |
| Adding Patient Mobile Phone Number | Cerner PM, Additional Demographics and Guarantor Information, Guarantor |
| | |
| | |
| | |
| | |
| | |

 © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.



# Cerner Tasks and Locations

## Welcome, Consents, PAM, CHE Scheduling

| CC Task | Cerner Location |
|---|---|
| Open Pt. Onboarding Report (refresh every day) & Filter by Practice | HealtheAnalytics |
| Adding Nephrologist / Provider Appointment | AdHoc, Care Mgmt, Renal Care Mgmt, Appointment Tracking |
| Entering Date of Death | Cerner PM, Additional Demographics and Guarantor Information, Date of Death |
| Adding Patient Mobile Phone Number | Cerner PM, Additional Demographics and Guarantor Information, Guarantor |
| | |
| | |
| | |
| | |
| | |

209    © 2022 DaVita Inc. All rights reserved. Proprietary and confidential.

# HIE Scheme

| Opt- In States | Opt- Out States | |
|---|---|---|
| California | Alabama | Maine |
| Connecticut | Maryland | New Hampshire |
| Florida | Arizona | New Jersey |
| Hawaii | Arkansas | New Mexico |
| Idaho | Colorado | North Carolina |
| Indiana | Delaware | North Dakota |
| Louisiana | Georgia | Ohio |
| Massachusetts | Illinois | Pennsylvania |
| Michigan | Iowa | South Carolina |
| Minnesota | Kansas | South Dakota |
| Missouri | Kentucky | Vermont |
| Montana | Nebraska | West Virginia |
| Nevada | Wisconsin | Wyoming |
| New York | | |
| Oklahoma | | |
| Oregon | | |
| Rhode Island | | |
| Tennessee | | |
| Texas | | |
| Utah | | |
| Virginia | | |
| Washington | | |

210   © 2021 DaVita Inc. All rights reserved. Proprietary and confidential.

Exhibit 2

# Clinical Incentive Program

Overview and Guide



Nephrology
Care Alliance®

© 2022 DaVita Inc. Confidential and Proprietary.

# Topics

Program Overview

Portal Guide

Communications and Reports

© 2022 DaVita Inc. Confidential and Proprietary.

2



# Clinical Incentive Program (CIP) Overview

**A clinical, outcomes-based payment program designed to improve patient outcomes and lower total patient costs in partnership with nephrologists**

## Program Basics

- Practice-level agreements
- Incentives for specific ESKD outcomes, which are a result of nephrologists' CKD care
- Eligible patients aligned to specific payors with an upstream value-based care agreement
- Program specific partner selection criteria determines practice eligibility

© 2022 DaVita Inc. Confidential and Proprietary.

3

# CIP 3.0 Metrics & Payments



| Metric – Definition* | Payment per Occurrence |
|---|---|
| **Home Start:** New ESKD patients whose 1st outpatient treatment is on home and remains on modality for a minimum of 90 days | $2,800 |
| **Outpatient ICHD Start:** New ESKD patients where 1st treatment is not in hospital. *Only applicable for BCBS MN payor program.* | $1,200 |
| **AVF/AVG Only Start:** New ESKD patients who start ICHD without a CVC in place | $1,000 |
| **CVC Removal:** ESKD patients who start ICHD with a CVC and have a removal within 90 days | $500 |
| **Home Conversion:** ESKD patients who transfer from ICHD to Home for a minimum of 90 days | $400 |
| **Controlling High Blood Pressure:** CKD patients with adequately controlled BP (<140/90) | $40 per patient/yr |
| **Appropriate ACEi/ARB Usage:** CKD patients 3-4 patients prescribed an ACEi/ARB | $35 per patient |
| **Transplant (CKD/ESKD):** CKD or ESKD patients whose kidney transplant stays healthy for at least 1 year, and up to 3 years. *Not applicable for CKCC government program.* | $15,000 over 3 years |

* Disclaimer: The language here is modified for presentation purposes. Reference executed agreements for Clinical Incentive Metric terms.

© 2022 DaVita Inc. Confidential and Proprietary.

4



# Practice Journey



**ONBOARDING**
- Automated Welcome Email
- Compliance Training completed
- Additional Portal training offered

**PERFORMANCE REPORTING & COMMUNICATION**
- Automated quarterly emails/reports
- Notifications when patients eligible for metric or when data is ready to attest
- Practice check status on portal as needed

**ATTESTATION & PAYMENT**
- Providers attest in portal
- Patient validated
- Payment sent to practice

© 2022 DaVita Inc. Confidential and Proprietary.

5

# Nephrologist Experience Process Flow*

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct |
|-----|-----|-----|-----|-----|-----|-----|-----|------|-----|

**Jan 1st**
Contract goes live and Practice receives Welcome email

**Jan 1st – Mar 31st (Q1)**
Attributed patients transition to ESKD or are converted to Home during Q1

**Apr 1st – Jun 30th (Q2)**
Q1 transitions and conversions have time to reach 90 day attribution and maintenance requirements

**Apr 14th**
Practice receives Quarterly Report email

**1st week in Aug**
Attribution received from NOVA for Mar

**Jul 14th**
Practice receives Quarterly Report email

**Sep 1st**
Validated outcomes input into portal for attestation

**Aug 7th – Sep 1st**
NCA team and TQ team validate metric outcomes

**Oct 1st**
Q1 payment period ends

**Sep 1st – Oct 1st**
Aligned nephs attest or dispute patients in the portal

**Oct 14th**
Practice receives incentive itemized for Q1 patients**

**Oct 1st – 14th**
TQ reviews and signs off final payments

\* Sample timeline – participation may begin at different points in a calendar year
\*\* Any outstanding attestations will be included in future payment cycles

© 2022 DaVita Inc. Confidential and Proprietary.

6

# Topics

Program Overview

**Portal Guide**

Communications and Reports

© 2022 DaVita Inc. Confidential and Proprietary.

7



# Accessing the Portal

1. Visit nephrologycarealliance.com
2. Select "**Login**" in the upper right-hand corner of the homepage
3. Log in using DaVita site credentials *(same as OneView)* or Portal-specific login
4. This will lead to the CIP homepage



© 2022 DaVita Inc. Confidential and Proprietary.

# CIP Homepage

**Select the program name on the left side navigation to view program dashboard**



Clicking on the individual metric cards opens the detailed eligible patient view for the metric

**Note that test data is being displayed for this demonstration**

© 2022 DaVita Inc. Confidential and Proprietary.

# Viewing Eligible Patients



**Nephrology Care Alliance.**

DEMO DATA PRACTICE
View as Practice Manager   Options

**Insights**

CKD Tracker
Patient View
High Risk Patients
CKD Reports
ESKD Attribution List
CKD Attribution List

< Back to Dashboard

**CHU**

Home Conversions
Date as of: 9/17/21

| Eligible Patients on In-Center Modality | Patients Converted to Home Modality for Less than 90 days | Patients Converted to Home Modality and Maintained for 90 days |
|---|---|---|
| 0 | 0 | 7 |

Filter metric results   [Filter]

∧ Attestation Required (0)

☐ Select All

| Patient Name ▼▲ | Date of Birth ▼▲ | Program Name ▼▲ | Home Conversion Metric Met? |
|---|---|---|---|

No Data Found

∧ Metric Not Yet Met or Verified (7)

| Patient Name ▼▲ | Date of Birth ▼▲ | Program Name ▼▲ | Home Conversion Metric Met? |
|---|---|---|---|
| DNYq qZNU | 11/13/1983 | CHU | Yes |
| AtDX lHbr | 10/12/1975 | CHU | Yes |
| ENJt ZpltM | 06/07/1970 | CHU | Yes |

**VBC**
CHU
Kidney Disease Education
Education
Cohort Management
Reporting

**CIP**

\*\*Note that test data is being displayed for this demonstration.\*\*

© 2022 DaVita Inc. Confidential and Proprietary.

10

# Attesting Patients

**To attest a patient:**

1. Select a patient and click the "**Attest**" button

2. Review the patient data and select the green "**Attest**" button

3. Click "**Submit**"



\*\*Note that test data is being displayed for this demonstration\*\*

© 2022 DaVita Inc. Confidential and Proprietary.

11

# Disputing Patients

**To dispute a patient:**

Review the patient data in the attestation popup box

1. Select the red **"Dispute"** button

2. Click **"Submit"**

3. Choose a reason for disputing the data in the dropdown menu

4. Use the edit tool to change listed data as needed

5. Click **"Submit"**



© 2022 DaVita Inc. Confidential and Proprietary.

12

**Note that test data is being displayed for this demonstration**



# Topics

Program Overview

Portal Guide

**Communications and Reports**

© 2022 DaVita Inc. Confidential and Proprietary.

# Practice Communications*



## Welcome Email

- Email sent to Practice participants after go-live on the effective date
- Notifies providers of participation, compliance training, and patient notifications

**Action: Notify NCA of the best Practice contact**

## Eligible Patient Notification

- Automated email sent from the Portal
- Notifies the provider one of their patients is eligible for CIP

**Action: Provider reviews patient in the Portal**

## Quarterly Report Email

- Email sent quarterly to Practice participants
- Provides overview of Practice results for the quarter

**Action: Provider(s) and/or Practice Manager reviews results details in the Portal**

## Patient Attestation Notification

- Automated email sent from the Portal
- Notifies provider to review and attest their patient(s)

**Action: Provider attests patient(s) in the Portal**

*Email content and formats are being enhanced for 7/1/22

14    © 2022 DaVita Inc. Confidential and Proprietary.

# Practice Facing Dashboard

## Reporting

- Easy quarterly reporting access for practices and nephrologists

- Accessible via NCA Portal website

- Total metric incentives met and potential

- Dashboard under final development stages in the portal





15    © 2022 DaVita Inc. Confidential and Proprietary.



# Questions?

## Email contact@nephalliance.com

© 2022 DaVita Inc. Confidential and Proprietary.

16

Exhibit 3

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## CLINICAL INCENTIVE PROGRAM (CIP) AGREEMENT

This Clinical Incentive Program Agreement ("Agreement") dated July 1st, 2022 ("Effective Date") is made and entered into by and between VillageHealth DM, LLC, a Delaware limited liability company, for itself and on behalf of Nephrology Care Alliance, LLC ("NCA"), a Delaware limited liability company (collectively, "Company"), and [**Insert Practice Name**] ("Practice").

## RECITALS

A.      DaVita Inc., a Delaware Corporation ("DaVita"), through Company, contracts with the commercial insurance programs set forth on **Attachment 1,** attached hereto, as may be modified from time to time (the "Programs" and each, individually, a "Program"), for purposes of, among other things, providing disease management and care coordination services to patients with chronic kidney disease ("CKD") and end-stage renal disease ("ESRD") who are covered under such Programs.

B.      Practice is a contracted provider with one or more of the Programs and is qualified to provide professional medical services to Program members with CKD and ESRD ("Members"). Members shall be defined as the Practice's patients who are qualified under those certain commercial plans (as listed in **Attachment 1**) through the patient's disease state or medical diagnosis.

C.      Company has established a clinical incentive program ("Clinical Incentive Program") as a means to improve the patient experience, population health, and care team well-being while lowering medical costs (the "Quadruple Aim") by contracting with eligible nephrologists on a pay-for-performance basis who implement certain care strategies and achieve the performance-based metrics developed by Company.

D.      Company desires that Practice through its nephrologists ("Participating Physicians") participate in the Clinical Incentive Program pursuant to and in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the parties, in consideration of the foregoing Recitals and the terms and conditions found below, the sufficiency of which is hereby acknowledged, agree to be bound as follows:

## AGREEMENT

1.      Engagement. Company hereby engages Practice, and Practice hereby accepts such engagement, to participate in the Clinical Incentive Program.

2.      Program Eligibility. In order to participate in the Clinical Incentive Program, Practice's Participating Physicians must (a) be a physician as defined in Section 1861(r)(1) of the Social Security Act, (b) Practice must have at least one patient who is an attributed Member to an eligible Program (a "Program Participant"), and (c) sign a joinder to this Agreement in form substantially similar to **Exhibit B** attached hereto.

3.  <u>Programs</u>. Following the Effective Date, in the event that Company contracts with commercial programs that Company desires to include under this Agreement, **Attachment 1** shall be updated to add such plans and programs, and upon notice to Practice, such plans and/or programs shall be the Programs covered under this Agreement. In the event that Company's contract with a Program is terminated or expires following the Effective Date, such plan shall no longer be covered under this Agreement, effective as of the date of termination or expiration, and **Attachment 1** shall be updated to remove such Program. Company shall notify Practice of the termination or expiration of a Program; <u>provided</u>, <u>however</u>, that the failure to provide such notice shall not reverse the fact that such Program will no longer be covered under this Agreement as of the effective date of termination or expiration.

4.  <u>Payment</u>.

(a)  Company shall pay Practice clinical incentive payments based on Practice providing services to achieve the clinical quality metrics ("<u>Metrics</u>") set forth on **Exhibit A**, which have been designed to further the Program's goal. If a particular Program has unique metrics such metrics shall be described in Attachment 1 and Exhibit A metrics shall not apply to such Program. Prior to paying Practice, Company shall have (i) received a copy of the notice furnished to Members in accordance with <u>Section 5(b)</u>, (ii) received a copy of the attestation from the Practice's Participating Physicians in accordance with <u>Section 5(d)</u>, and (iii) documented the amount and basis for such payment, which documentation shall be provided to Practice at the time of payment and maintained by Company and Practice in accordance with <u>Section 14</u> hereof.

(b)  Company and Practice shall monitor and assess the outcome measures and determine whether the Metrics meet the Quadruple Aim on an annual basis. The clinical evidence relied upon to select the outcome measures is set forth in **Exhibit E**.

5.  <u>Payment Criteria</u>. The following criteria are conditions to payment under the Clinical Incentive Program:

(a)  Practice shall prepare and maintain records of all services provided to Members, complete and submit accurate claims, and deliver to Company upon Company's request such information as is necessary for Company to determine that the services have been performed and the Metrics have been met, each in a form satisfactory to Company.

(b)  Practice shall provide written notice to Members that Practice is participating in the Clinical Incentive Program, a copy of which shall be provided to Company and maintained by the parties in accordance with <u>Section 14</u> of this Agreement.

(c)  Practice shall permit Company to perform a pre-payment audit of Program Participants' medical records pertaining to the Members, Member claims, and other records as necessary for Company to determine if the services have been performed and the Metrics have been met. If required, Practice shall provide evidence satisfactory to Company, in its reasonable discretion, proving resolution of matters identified during such pre-payment audit.

(d)  Practice's Participating Physicians shall execute and deliver an attestation certifying the truth, accuracy, and completeness of all reported and documented services and data

when reported to Company in the form of **Exhibit C**, which may be completed through the Clinical Incentive Program web portal.

(e)     Practice's Participating Physicians shall complete the compliance training described in Section 11(b) within 90 days of the Effective Date, unless already completed by Practice's Participating Physician.

6.     Recoupment. Company shall have the right to recoup any Clinical Incentive Program payment made to Practice if it is determined that such payment is or was (a) made based on false or inaccurate data reported by Practice (or his or her practice or agent), (b) an overpayment to Practice resulting from a mistake in calculating amounts owed to Practice, or (c) made prior to Practice's Participating Physicians completing the compliance training described in Section 11(b).

7.     Company Representations and Warranties. Company represents and warrants to Practice that:

(a)     Clinical Incentive Program payments to Practice are based only on Practice's Participating Physicians achieving the Metrics through medically necessary services performed by a Participating Physician within a Practice, and such other clinical-based performance criteria as may be specified by Company in writing from time to time.

(b)     Company has determined eligibility for Clinical Incentive Program payments uniformly for similarly situated physicians and/or physician groups.

(c)     The methodology for determining Clinical Incentive Program payments does not take into account, and payment of Clinical Incentive Program payments to Practice is not conditioned on, directly or indirectly, the volume or value of any physician referrals of items or services to, or any business generated for, Company or its affiliates.

(d)     Company is not providing Clinical Incentive Program payments to induce Practice's Participating Physicians to reduce or limit medically necessary care to any Member.

(e)     Costs related to the Clinical Incentive Program are not being shifted to any Federal health care program.

8.     Practice Representations and Warranties. Practice and Practice's Participating Physicians represent and warrant to Company that:

(a)     Practice does not condition the receipt or amount of Clinical Incentive Program payments on doing business with Company or any individual or entity affiliated with Company.

(b)     Neither Practice nor Practice's Participating Physicians will reduce or limit medically necessary care to any Member as a result of being eligible to receive the Clinical Incentive Program payments.

(c)     Costs related to the Clinical Incentive Program are not being shifted to any

Federal health care program.

9. <u>Joint Obligations and Agreements</u>.

(a) <u>Program Agreement and Terms</u>. In the performance of this Agreement, Company, Practice, and Practice's Participating Physicians will comply with all applicable terms and conditions of the agreement or agreements to which each is bound with the Programs.

(b) <u>Clinical Care Decisions</u>. Company and Practice each acknowledges and agrees that: (i) all clinical care decisions are and will remain the sole responsibility of Practice and Practice's Participating Physicians; and (ii) Company will not interfere in any manner with Practice's Participating Physician's provision of care that is medically necessary and appropriate for any Member. The parties further acknowledge and agree that nothing in this Agreement shall be construed to prohibit or limit Practice from referring Members to any dialysis facility or other provider.

(c) <u>Authority</u>. Company and Practice each represents that it has the power and authority to execute and deliver this Agreement, and to carry out the transactions and obligations contemplated herein.

(d) <u>No Conflict</u>. The execution, delivery, and compliance with and the performance by each of Company and Practice of this Agreement does not and will not violate, conflict with, or constitute a material default under any other agreement or order to which Company or Practice, as the case may be, is or may be a party or is or may be bound.

10. <u>Non-Circumvention</u>.

(a) During the Term (as defined in <u>Section 15</u>), the parties understand and agree that: (i) Practice will have access to proprietary and confidential information related to Company's Clinical Incentive Program and Metrics developed by Company as set forth in this Agreement, and certain clinical protocols, guidance, and training from Company that are intended to enhance Practice's ability to achieve the Quadruple Aim for Members; and (ii) Practice and Practice's Participating Physicians will furnish key clinical interventions to Members enrolled in or aligned with Programs that are intended to enhance Company's ability to achieve the Quadruple Aim for Members.

(b) Accordingly, in consideration of the foregoing: (i) Company covenants that it shall: (1) afford Practice reasonable opportunity to participate in Programs in the State of [***insert relevant state***]; and (2) utilize clinical data concerning Members received by Company from Practice solely for the provision services furnished under this Agreement; and (ii) Practice and Practice's Participating Physicians covenant that he/she/it shall not: (1) discriminate against Company or DaVita relative to other dialysis providers or engage in any conduct that would, directly or indirectly, detrimentally impact a Member's ability or willingness to select DaVita for dialysis treatment; or (2) enter into contracts directly with Programs, for the provision of services for the purpose of achieving the Metrics in exchange for clinical incentive payments in a manner substantially similar to the terms of this Agreement (i.e. no "double dipping").

(c)     For the avoidance of doubt, the parties agree that nothing in this <u>Section 10</u> or elsewhere in this Agreement shall be construed to prohibit Practice or Practice's Participating Physicians from: (i) referring Members to any dialysis facility or other provider or supplier; or (ii) entering into participating provider agreements with Programs for the provision of services to such Programs' members using a fee-for-service, value based payment, or other compensation model.

11.     <u>Compliance with Laws, Rules and Regulations</u>.

(a)     <u>Compliance with Applicable Laws and Regulations</u>. Company, Practice, and Practice's Participating Physicians enter into this Agreement with the intent of conducting their relationship in full compliance, and hereby covenant that during the Term they shall comply, with all applicable federal, state and local laws and regulations including, but not limited to: (i) the False Claims Act (31 U.S.C. § 3729 et seq.); (ii) the anti- kickback statute (42 U.S.C. § 1320a-7b(b)) (the "<u>Anti-Kickback Statute</u>") and any applicable state anti-kickback laws; (iii) the civil monetary penalties law (42 U.S.C. § 1320a-7a); (iv) the Federal Ethics in Patient Referrals Act (42 U.S.C. § 1395nn) or any successor thereto and any applicable state self-referral laws; (v) all other federal and state laws including those prohibiting discrimination; (vi) all applicable laws, regulations and governmental standards relating to licensing, certification, and operation of dialysis facilities, including without limitation any federal and state ESRD programs; (vii) any applicable state patient privacy laws; and (viii) DaVita's corporate compliance program (including its Code of Conduct and Policies and Procedures (as each is defined below)).

(b)     <u>Compliance Program and Training</u>. Company, Practice, and Practice's Participating Physicians each acknowledge that Company, DaVita, and their affiliates promote compliance and have established a culture that fosters the prevention, detection, and resolution of instances of misconduct. In furtherance thereof, Practice's Participating Physicians agree to comply with the corporate compliance program of DaVita by: (i) participating in required compliance training (including annual on-line training that includes, but is not limited to, training on the Anti-Kickback Statute); and (ii) providing affirmation to Company on an annual basis certifying compliance with such training requirements. The required compliance training includes training on DaVita's HIPAA policies, and other policies and procedures designed to ensure compliance with relevant Federal health care program requirements that are applicable to the activities of such parties as required by this Agreement ("<u>Policies and Procedures</u>"), and DaVita's Code of Conduct. Practice's Participating Physicians shall receive a copy of DaVita's Code of Conduct and Policies and Procedures, in either hard copy or electronic form as part of the compliance training or in advance of the training.

(c)     <u>Notice of Certain Matters</u>. Practice and/or Practice's Participating Physicians shall provide written notice to the Chief Compliance Officer of DaVita or Company or such other appropriate designee of DaVita or Company, of violations of any federal health care program requirements or of DaVita's Code of Conduct and Policies and Procedures, within two business days of learning of the event giving rise to such notice, including a description of the violation.

(d)     <u>Non-Exclusion</u>. Practice and Practice's Participating Physicians represent and warrant that he/she/it (i) is not currently excluded from participation in any federal health care program, as defined under 42 U.S.C. § 1320a-7b, (ii) is not currently excluded, debarred,

suspended, or otherwise ineligible to participate in federal procurement or nonprocurement programs, and (iii) has not been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a- 7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible. Practice and/or Practice's Participating Physicians covenant and agree to notify Company within two business days of learning of any such exclusion described in this Section 11(d).

(e)　　Compliance Certification. Each of Company, Practice, and Practice's Participating Physicians certify that this Agreement is not intended to generate referrals for services or supplies for which payment may be made in whole or in part under any federal health care program. Company and Practice and/or Practice's Participating Physicians each agree to comply with statutes, rules, and regulations as promulgated by federal and state regulatory agencies or legislative authorities having jurisdiction over the parties.

12.　　HIPAA. The parties acknowledge and agree that they are subject to the provisions of the Health Information Portability and Accountability Act of 1996, as amended ("HIPAA"), in the performance of their obligations under this Agreement. The parties shall comply with the requirements of HIPAA in relation to access to, and maintaining the privacy and security of, protected health information, and enter into a Business Associate Agreement substantially in the form set forth in **Exhibit D**.

13.　　Confidentiality. Except as otherwise required by law, valid legal process, or order, each party agrees to treat all non-public information of the other party as confidential, and will not, without written authorization from the other party, release or share such information with any third party, nor intentionally utilize such information to the detriment of the other party. Such information will include, but is not limited to, a party's manuals, methods, business strategies, trademarks, procedures, policies, financial information, and other information that the receiving party reasonably should know is confidential or proprietary to the disclosing party.

14.　　Maintenance of Records. Practice shall maintain comprehensive records of all services provided to and claims submitted on behalf of Members in accordance with applicable law. If required under applicable law, Company and Practice each agrees to maintain and give DHHS, the Comptroller General, OIG, CMS, and, as applicable, their designees, access to all books, contracts, records, documents and other evidence (collectively, "Records"). Company and Practice each will maintain such Records for a period of ten years following the termination or expiration of this Agreement, or from the date of completion of any audit, evaluation, or inspection, whichever is later; provided, that Practice shall retain Records for a longer period of time if any such Federal governmental agency having jurisdiction over this Agreement determines that: (a) a particular Record or group of Records must be maintained for a longer period; (b) there has been a termination, dispute, fraud or similar fault, by Company or Practice, in which case the retention may be extended to six years from the date of final resolution of the matter; or (c) there is a reasonable possibility of fraud, in which case inspection of Records may be conducted at any time.

15.　　Term. This Agreement will take effect on the Effective Date and continue in effect for three years (the "Term") unless terminated earlier by mutual agreement or as otherwise provided herein.

16.     Termination.

(a)     This Agreement may be terminated by either party for any reason upon 30 days prior written notice to the other party.

(b)     This Agreement may be terminated immediately by either party upon a party's declaration of bankruptcy or receivership or an assignment for the benefit of creditors.

(c)     This Agreement shall immediately terminate upon the termination of Company's or Practice's agreements with all of the Programs.

(d)     This Agreement may be terminated immediately by Company upon Practice's: (i) receipt of notice of the loss or substantial impairment of Practice's professional liability insurance; (ii) exclusion or suspension from participation in any health care program; or (iii) failure to meet the requirements set forth in Section 2 of this Agreement. Any Participating Physician's Joinder to this Agreement may be terminated immediately by Company upon Practicing Physician's: (i) receipt of notice of the loss or substantial impairment of Practicing Physician's professional liability insurance; (ii) exclusion or suspension from participation in any health care program; or (iii) failure to meet the requirements set forth in Section 2 of this Agreement.

(e)     If the performance by either party of any term of this Agreement: (i) jeopardizes the licensure of either party; (ii) jeopardizes either party's participation in any federally funded health care program, any other governmental reimbursement or payment programs, or any other state or nationally recognized accrediting organization; or (iii) violates any statute or ordinance, or be otherwise deemed illegal, unethical, invalid, or unenforceable by any recognized body, agency, or association in the medical field, then either party shall have the right to initiate the renegotiation of the affected term(s) of this Agreement upon written notice to the other party to remedy such condition. The parties must use good faith and best efforts to renegotiate or restructure this relationship so as to bring any such provision into compliance so as (x) not to cause any of the circumstances described in subsections (i) - (iii) of this Section 16(e), and (y) make the same lawful, valid, enforceable, or ethical, and to the extent possible, maintain the economic benefits to the parties as contemplated hereunder. If the parties are unable to renegotiate the term(s) so affected as described herein within 90 days of the date on which notice of a desired renegotiation is given, then either party shall be entitled, after the expiration of such 90 day period, to terminate this Agreement.

17.     Post-Termination Rights and Obligations.

(a)     Upon termination or expiration of this Agreement for any reason, (i) the parties will work together to ensure a smooth transition of their respective responsibilities without disrupting the care being provided to Members; and (ii) Practice must deliver to Company all materials and documents received or generated in connection with the Clinical Incentive Program.

(b)     If this Agreement is terminated within one year of the Effective Date, then the parties will not enter into any similar agreement with each other for the services covered

hereunder before the first anniversary of the Effective Date.

(c)     Termination or expiration of this Agreement shall not relieve a party of obligations incurred prior to the effective date of termination. The provision of this Section 17, and of Sections 4, 5, 6, 12, 13, 14 and 18, and any other provision that shows the parties intended it to survive, shall survive the expiration or termination of this Agreement.

18.     Dispute Resolution.

(a)     Informal Resolution. The parties shall attempt to resolve any dispute arising under this Agreement by providing written notice of such dispute to the other party, and thereafter, through appropriate representatives, meeting and attempting to resolve the dispute in face-to-face negotiations. This meeting must occur within 30 days of the date on which the written notice of such dispute is received by the other party.

(b)     Resolution through Mediation. If no resolution is reached through informal resolution within 45 days of the first meeting referred to in Section 18(a), the parties shall attempt to settle the dispute by formal mediation administered by the American Arbitration Association ("AAA") in Company's state. Such mediation must occur within 45 days of the date a party's request for mediation is submitted to the AAA. All findings of fact and results of such mediation must be in written form prepared by the AAA and provided to each party. If the parties are unable to resolve the dispute through formal mediation the parties shall be entitled to seek any and all available legal remedies.

(c)     Injunctive Relief to Prevent Irreparable Harm. Nothing in Section 17 or Section 18 prevents any party from seeking temporary restraining orders or preliminary or permanent relief to enjoin conduct which may cause that party irreparable harm pending the outcome of the procedures set forth in Section 18.

19.     Miscellaneous.

(a)     Independent Contractors. The relationship between the parties under this Agreement is that of independent contractors, and nothing in this Agreement will be construed to create any employer and employee, principal and agent, partnership, joint venture or other relationship.

(b)     Assignment. Neither party shall assign or otherwise transfer this Agreement or any of its rights hereunder, or delegate any of its obligations hereunder, without the prior written consent of the other party; provided that Company may assign its rights and obligations hereunder to an affiliate without Practice's prior written consent.

(c)     Governing Law; Venue. This Agreement will be governed by the laws in the state of Delaware, and the parties consent to jurisdiction of the federal and state courts located therein.

(d)     Severability. Upon a determination that any term or its application in this Agreement is invalid or unenforceable, the remainder of this Agreement will not be affected, and if any such term constitutes a material term, the parties will promptly work in good faith to modify

this Agreement to retain, if possible, the overall essential terms of this Agreement.

      (e)    Incorporation, Entire Agreement, and Counterparts. This Agreement contains the entire agreement of the parties with respect to the matters addressed herein and supersedes all other agreements between the parties, whether oral or in writing, concerning such matters. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and when taken together shall constitute one agreement. Facsimile or PDF transmission of original signatures shall constitute and be accepted as original signatures.

      (f)    Notices. Any notices to be given hereunder must be (i) in writing, (ii) addressed to the person and address set forth below (or to such other person or address as either Party may so designate from time to time), (iii) transmitted by courier for hand delivery, or delivered by nationally recognized overnight delivery service with instructions for overnight delivery, and (iv) deemed to have been given on the date of delivery if transmitted by courier, or one day following traceable delivery to a nationally recognized overnight delivery service with instructions for overnight delivery if sent by such overnight delivery service:

NOTICE ADDRESS

| If to Company: | VillageHealth DM, LLC<br>2000 16th Street 12th Floor<br>Denver, Colorado 80202<br>Attention: General Manager | With copy to: | Nephrology Care Alliance, LLC<br>2000 16th Street, 12th Floor<br>Denver, Colorado 80202<br>Attention: NCA General Counsel |
|---|---|---|---|

| If to Practice: | [***Enter Practice Name/Address***]<br>Street Address<br>City, State Zip<br>Attention: |
|---|---|

      (g)    Binding Agreement. The terms of this Agreement will be binding upon, inure to the benefit of, and be enforceable by, Company and Practice, their respective heirs, legal representatives, and their permitted successors and assigns. All representations and warranties set forth herein will survive the termination or expiration of this Agreement.

      (h)    Amendments. Except as otherwise provided herein, this Agreement may only be modified or amended in a written document signed by Company and Practice. During the Term, Company may amend this Agreement as needed to address any legal requirement described in Section 9(a) that may apply to this Agreement by attaching a regulatory compliance addendum hereto upon notice to (but without the prior written consent of) Practice or Practice's Participating Physician.

      (i)    Waivers. The failure of Company, Practice, and/or Practice's Participating Physicians to insist in any instance upon performance of any term or condition of this Agreement will not be construed as a waiver of future performance of any such term or condition, and the Parties obligations with respect thereto will continue in full force and effect.

      (j)    <u>NCA Portal Terms of Service</u>. The Practice acknowledges and agrees to the NCA Portal's terms of service, which is the online portal that the Practice will utilize to access CIP performance data, information, and attestation forms. These terms of service are incorporated herein by reference and may be found at https://nca.nephrologycarealliance.com/terms-of-use.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement through their authorized representatives, effective as of the Effective Date.


COMPANY:
VILLAGEHEALTH DM, LLC

By: _____

Name:  Briah Carey

Title:   Group Vice President

Date: _____


APPROVED AS TO FORM ONLY

By: _____

Name:  Charmaine Rose

Title:   Assistant Gen


PRACTICE
[***Ent                          ]

By: _____

Name: _____

Title: _____

FEIN/TIN: _____

Date: _____

# ATTACHMENT 1

# PROGRAMS

This Attachment 1, Programs, effective as of the Effective Date of the Agreement, shall cover all upstream arrangements as specifically defined in the Service Line Attachments to this Attachment 1, as updated and amended from time to time.

## CIGNA HEALTH CORPORATION

### SERVICE LINE TO ATTACHMENT 1

Nephrology End State Renal Disease Pay for Performance Program Addendum between Cigna Health Corporation and DaVita Inc. through its wholly-owned subsidiary VillageHealth DM, LLC dated March 13, 2018.

Program Specific Criteria:

1.  The following Metrics shall not apply to Members under this Program:

    a.  Outpatient (In-Center Hemodialysis, "ICHD") Start Quality;

    b.  Controlling High-Blood Pressure ("HBP"); and

    c.  Appropriate Angiotensin-Converting Enzyme Inhibitor ("ACEi") or Angiotensin Receptor Blocker ("ARB") Usage.

2.  Members must receive dialysis at a dialysis facility owned in whole or in part, directly or indirectly, by DaVita.

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## HUMANA INSURANCE COMPANY

## SERVICE LINE TO ATTACHMENT 1

ESRD Care Management Agreement by and between DaVita Inc. on behalf of itself and its affiliate VillageHealth DM, LLC and Humana Insurance Company and its affiliates that underwrite or administer health plans effective June 1, 2018.

Program Specific Criteria:

1. The following Metrics shall not apply to Members under this Program:

   a. Controlling High-Blood Pressure ("HBP"); and

   b. Appropriate Angiotensin-Converting Enzyme Inhibitor ("ACEi") or Angiotensin Receptor Blocker ("ARB") Usage.

2. Members must receive dialysis at a dialysis facility owned in whole or in part, directly or indirectly, by DaVita.

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## UNITEDHEALTHCARE INSURANCE COMPANY

### SERVICE LINE TO ATTACHMENT 1

ESRD Agreement by and between UnitedHealthcare Insurance Company, on behalf of its and its affiliates and subsidiaries, and DaVita Inc., on behalf of itself and its affiliate VillageHealth DM, LLC dated December 11, 2018.

Program Specific Criteria:

1. The following Metrics shall not apply to Members under this Program:

   a. Outpatient (In-Center Hemodialysis, "ICHD") Start Quality;

   b. Controlling High-Blood Pressure ("HBP"); and

   c. Appropriate Angiotensin-Converting Enzyme Inhibitor ("ACEi") or Angiotensin Receptor Blocker ("ARB") Usage.

2. Members must receive dialysis at a dialysis facility owned in whole or in part, directly or indirectly, by DaVita.

15

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## AETNA NETWORK SERVICES LLC

### SERVICE LINE TO ATTACHMENT 1

ESRD Agreement by and between Aetna Network Services, LLC, on behalf of its and its affiliates and subsidiaries, and DaVita Inc., on behalf of itself and its affiliate VillageHealth DM, LLC dated July 1, 2021.

Program Specific Criteria:

1. The following Metrics shall not apply to Members under this Program:

   a. Controlling High-Blood Pressure ("HBP"); and

   b. Appropriate Angiotensin-Converting Enzyme Inhibitor ("ACEi") or Angiotensin Receptor Blocker ("ARB") Usage.

2. Members must receive dialysis at a dialysis facility owned in whole or in part, directly or indirectly, by DaVita.

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## UCARE MINNESOTA

## SERVICE LINE TO ATTACHMENT 1

The Facility Participation Agreement by and among UCare Minnesota, together with its affiliate UCare Health, Inc., and DaVita Inc., on behalf of itself and its affiliates and subsidiaries listed on Exhibit C thereto, dated September 1, 2007, as amended effective July 1, 2021.

Program Specific Criteria:

1. The following Metrics shall not apply to Members under this Program:

    a. Controlling High-Blood Pressure ("HBP");

    b. Appropriate Angiotensin-Converting Enzyme Inhibitor ("ACEi") or Angiotensin Receptor Blocker ("ARB") Usage; and

    c. Transplant (CKD/ESKD).

2. Members must receive dialysis at a dialysis facility owned in whole or in part, directly or indirectly, by DaVita.

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## BLUE CROSS and BLUE SHIELD of MINNESOTA

## SERVICE LINE TO ATTACHMENT 1

CKD and ESRD Care Management Program Agreement between Blue Cross and Blue Shield of Minnesota, Inc. on behalf of itself and its Affiliates and subsidiaries, and DaVita Inc., on behalf of itself and its affiliate VillageHealth DM, LLC dated February 11, 2021.

Program Specific Criteria:

1. None.

## EXHIBIT A

## CLINICAL INCENTIVE PAYMENT METHODOLOGY

1.      <u>Quality Metrics</u>. Practice must achieve the following clinical performance-based Metrics with respect to Members who participate in the Clinical Incentive Program for no fewer than 90 days:

        a.      <u>Controlling High-Blood Pressure ("HBP")</u>. A Chronic Kidney Disease ("CKD") Member who had a diagnosis of hypertension and whose blood pressure ("BP") was adequately controlled (<140/90 mmHg) in most recent measure in a calendar year.

        b.      <u>Appropriate Angiotensin-Converting Enzyme Inhibitor ("ACEi") or Angiotensin Receptor Blocker ("ARB") Usage.</u> A CKD 4 Member diagnosed with hypertension and UACR >300 mg/g or UPCR >0.3g prescribed ACEi or ARB and present in an active medication list during program eligibility. The following rule applies:

              i.      <u>ACEi or ARB Usage payment is only issued once in program lifetime of an attributed Member with the treating Practice.</u>

        c.      <u>Transplant.</u> CKD or ESKD patients whose kidney transplant stays healthy for at least 1 year, and up to 3 years. The following rules apply:

              i.      Transplant outcomes are paid based on annual anniversary dates of transplantation.

              ii.     The remaining payments will be forfeited if:

                 1.      The transplant fails or is removed.

                 2.      The Member is placed on chronic dialysis.

                 3.      The Member returns to renal replacement dialysis.

                 4.      The Member expires during the 3-year Transplant payment period.

              iii.    If a Member receives a re-transplantation, the Transplant metric is earned again in accordance with transplant years 1-3 payments in Section 2 below.

        d.      <u>Outpatient (In-Center Hemodialysis, "ICHD") Start.</u> An End Stage Kidney Disease ("ESKD") Member's first ever outpatient dialysis treatment is not preceded by an inpatient dialysis treatment. The following rules apply:

              i.      Member may have a CVC in place.

              ii.     Can be combined with "AVF/AVG Only Start" when that metric definition is also met.

              iii.    Cannot be combined with "Home Start".

              iv.     Only applicable for ICHD.

e.    <u>Home Start.</u> An ESKD Member's first date of outpatient dialysis ("<u>FDOD</u>") is at home using either peritoneal dialysis ("<u>PD</u>") or home hemodialysis ("<u>HHD</u>" and collectively with PD, a "<u>Home Modality</u>") and Member remains on the Home Modality for a period of not less than 90 days from FDOD. A Member will be considered to have had a FDOD if the Member's first date of outpatient dialysis is within 30 days of his or her first dialysis treatment ever. The following rules apply:

> i.    Home modality includes PD and HHD.
>
> ii.    Member may have a CVC in place.
>
> iii.    Cannot be combined with "Outpatient (ICHD) Start" or "AVF/AVG Only Start".

f.    <u>Arteriovenous Fistula or Graft ("AVF/AVG") Only Start.</u> An ESKD Member's FDOD is with a working arteriovenous ("<u>AV</u>") fistula or graft as of the FDOD without a central venous catheter ("CVC") in place on such FDOD. Member also remains on the outpatient modality, without insertion or re-insertion of a CVC, for a period of not less than 90 days from FDOD. A Member will be considered to have had a FDOD if the Member's FDOD is within 30 days of his or her first dialysis treatment ever. The following rules apply:

> i.    Can be combined with "Outpatient (ICHD) Start" when that metric definition is also met.
>
> ii.    Cannot be combined with "Home Start".

g.    <u>Central Venous Catheter ("CVC") Removal.</u> An ESKD Member's FDOD is in the outpatient ICHD setting with either an active CVC or an inactive CVC and the Member has transitioned to any access other than CVC within 90 days of the FDOD through AVF, AVG or PD catheter. The following rules apply:

> i.    Cannot be earned if "Home Start" or "AVF/AVG Only Start" already earned at start of dialysis.
>
> ii.    Can be earned if "Outpatient (ICHD) Start" earned at start of dialysis.
>
> iii.    Can be combined with "Home Conversion" when that metric definition is also met.

h.    <u>Home Conversion.</u> An ESKD Member who has transitioned from ICHD to a Home Modality and remains on the Home Modality for a period of not less than 90 days from date of transition. The following rules apply:

> i.    Home modalities include PD and HHD.
>
> ii.    Transfers between PD to HHD or HHD to PD are not eligible.
>
> iii.    Cannot be earned if "Home Start" already earned at start of dialysis.

     iv.   Can be earned if "Outpatient (ICHD) Start" and/or "AVF/AVG Only Start" earned at start of dialysis.

     v.   Can be combined with "CVC Removal" when that metric definition is also met.

2.    <u>Calculation and Payment of Clinical Incentive Payments</u>. No later than 180 days following the end of each Calendar Quarter, Company will calculate outcomes for reporting to Practice any Clinical Incentive Program payment for Participating Physician attestation and subsequent payment as follows:

    a.    For each applicable Member that experiences Controlling HBP, Company will pay Practice an amount equal to forty dollars ($40.00) per Member, per calendar year.

    b.    For each applicable Member that experiences Appropriate ACEi/ARB Usage, Company will pay Practice an amount equal to thirty five dollars ($35.00) per Member, per program lifetime.

    c.    For each applicable Member that experiences a Transplant, Company will pay Practice an amount equal to two thousand five hundred dollars ($2,500.00) for year 1, five thousand dollars ($5,000.00) for year 2, and seven thousand five hundred dollars ($7,500.00) for year 3.

    d.    For each applicable Member that experiences an Outpatient (ICHD) Start, Company will pay Practice an amount equal to one thousand two hundred dollars ($1,200.00).

    e.    For each applicable Member that experiences a Home Start, Company will pay Practice an amount equal to two thousand eight hundred dollars ($2,800.00).

    f.    For each applicable Member that experiences an AVF/AVG Only Start, Company will pay Practice an amount equal to one thousand dollars ($1,000.00).

    g.    For each applicable Member that experiences CVC Removal, Company will pay Practice an amount equal to five hundred dollars ($500.00).

    h.    For each applicable Member that experiences a Home Conversion, Company will pay Practice an amount equal to four hundred dollars ($400.00).

    i.    Company shall not make payment for a Practice's Participating Physician's patient Member where the Practice's Participating Physician: (i) did not sign a Joinder to participate in Program; (ii) did not complete the required compliance training within the mandated timeline; (iii) did not sign the attestation verifying the physician's completion of the metrics outlined in Section 1, above; or (iv) became ineligible to participate in the Program during the course of the Program timeframe for an otherwise eligible Member.

    j.    Metrics can only be achieved for Members who are attributed to Program at the time the outcome occurs.

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

## EXHIBIT B

### JOINDER TO CLINICAL INCENTIVE PROGRAM AGREEMENT

Reference is made to the Clinical Incentive Program Agreement ("Agreement") dated July 1st, 2022 ("Effective Date") by and between VillageHealth DM, LLC, a Delaware limited liability company on behalf of Nephrology Care Alliance, LLC ("Company"), and [***Insert Practice Name***] ("Practice").

I, the undersigned physician (Practice's Participating Physician), hereby acknowledge that I will benefit directly from the Clinical Incentive Program Agreement. In consideration thereof, the undersigned agrees with and guarantees to Company and Practice the undersigned shall abide by the terms and conditions of the Agreement, as if an original party to the Agreement.

IN WITNESS WHEREOF, the undersigned has executed this as of the date first set forth above.

By: _____

Print Name: _____

NPI No.: _____


Acknowledged:

[***PRAC                               VILLAGEHEALTH DM, LLC

By: _____               By: _____

Name: _____               Name: _____

Title: _____     Title: _____

22

**EXTERNAL DISCUSSION DRAFT**
**April, 2022**

**EXHIBIT C**

**FORM OF ATTESTATION OF SERVICES PERFORMANCE**

I, [**\*Typed Physician Name\***], hereby certify to the truth, accuracy, and completeness of all reported and documented services personally performed by me or directed by me to Program Participants and delivered to Company pursuant to the terms of the Clinical Incentive Program Agreement.

I understand that any falsification, omission, or concealment of material fact may result in administrative, civil, or criminal liability, denial of a performance-based payment or recoupment of any performance-based payment.

_____

Signature

Date: _____

SPECIMEN
DO NOT SIGN

## EXHIBIT D

## BUSINESS ASSOCIATE AGREEMENT

**THIS BUSINESS ASSOCIATE AGREEMENT** ("BAA") is entered into by and between _____ _____ ("Covered Entity") and DaVita Inc., by and on behalf of its subsidiaries, affiliates, and related organizations (collectively, the "Business Associate"), as of the last date of signature ("Effective Date").

### R E C I T A L S

**WHEREAS**, Business Associate provides products and/or services (collectively "Deliverables") as set forth in an agreement, _____, dated _____ ("Agreement") to Covered Entity that may require Business Associate to access, create, receive, maintain, use or transmit Protected Health Information or other health information that is protected by state and/or federal law; and

**WHEREAS**, the Business Associate is obligated to protect the privacy and security of individually identifiable health information ("Protected Health Information" or "PHI"), including but not limited to electronic protected health information ("EPHI"), created on behalf of, received from, maintained on behalf of, or transmitted by or on behalf of Covered Entity in accordance with the Health Insurance Portability and Accountability Act of 1996 and its implementing privacy and security regulations at 45 C.F.R. Parts 160 and 164 promulgated by the U.S. Department of Health and Human Services ("HHS"), as amended by the federal Health Information Technology for Economic and Clinical Health Act ("HITECH Act") and its implementing regulations, including but not limited to the federal breach notification rule at 45 C.F.R. Part 164, subpart D (collectively "HIPAA"); and

**WHEREAS**, Covered Entity and Business Associate desire to enter into this BAA in order to comply with HIPAA, as may be modified or amended, including future issuance of regulations and guidance by HHS, and reflect their understanding of the use, disclosure and general confidentiality obligations of Business Associate regarding PHI that it creates on behalf of, receives from or on behalf of, maintains on behalf of, or transmits by or on behalf of Covered Entity in furtherance of the Agreement.

**NOW, THEREFORE**, the parties agree as follows:

## 1. DEFINITIONS

Capitalized terms used herein but not otherwise defined in this BAA shall have the same meanings as set forth in HIPAA, as may be modified or amended, including future issuance of regulations and guidance by HHS.